**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

| | | |
|---|---|---|
| BARBARA WILBON,<br><br>Plaintiff,<br>v.<br><br>SUNBELT MODULAR, INC.;<br><br>SOUTHEAST MODULAR MFG., ELLAVILLE d/b/a PROMOD MANUFACTURING;<br><br>MSOUTH EQUITY PARTNERS, as successor in interest to SUNBELT MODULAR, INC.; and<br><br>LITTLEJOHN & CO. LLC, as successor in interest to SUNBELT MODULAR, INC., all jointly and severally,<br><br>Defendants, | ) | Civ. Action No.<br><br>Complaint<br>Damages and Injunctive Relief<br>Jury Trial Requested |

**COMPLAINT**

## I. JURISDICTION AND VENUE

1. This is an action to remediate and vindicate deprivations of the right to be free from race and gender discrimination and retaliation in employment, where those rights are secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and by the Civil Rights Act of 1866, 42 U.S.C. § 1981 for race discrimination in contracting and employment, as amended by the Civil Rights Act of 1991 ("Section 1981"); which is premised on the Thirteenth and Fourteenth amendments.

2. The Court has original jurisdiction of Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3), and of Plaintiff's Section 1981 claims pursuant to 28 U.S.C. § 1343(a)(3) and (4).
3. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2), because Defendant conducts business in this district and a substantial portion of the events giving rise to the claims occurred in this district and division.
4. The action is ripe to be filed because the Equal Employment Opportunity Commission issued a right-to-sue letter dated 03/27/2025, for Charge no. 410-2024-04855 as to respondent Southeast, alleging race, sex, retaliation, and age; and there is a pending Charge no. 410-2024-11341 against Sunbelt, alleging similar unlawful acts, which is still pending before the EEOC, and the EEOC website indicates pending mediation.

**II. PARTIES**

**Parties and Background**

5. Plaintiff Barbara Wilbon ("Plaintiff" or "Ms. Wilbon") is an adult African American female citizen of the United States residing in Georgia. She can be reached at barbarawilbon@aol.com and 229-944-0450.
6. Plaintiff was an employee of Sunbelt, or in the alternative, an employee of the joint employers Sunbelt and Southeast, or in the alternative Southeast was her employer, but all are covered by Title VII because they each have 15 or more employees and significant interstate commerce involvement.
7. From her hiring in September 2020, through her termination in February 2024, at the Southeast plant in Ellaville, Georgia, Plaintiff answered directly to whoever was then serving as the Chief Financial Officer of Sunbelt, in Phoenix, and was employed as

Accounting and HR manager hired to make Accounting and HR changes during the period of transition when Sunbelt was imposing its control and changes to Southeast ProMod, Ellaville, Georgia, as is further addressed below throughout and in particular at 603 South Broad Street, Ellaville, GA 31806.

8. Sunbelt Modular Inc. headquarters are at 5301 W, Madison St, Phoenix, Arizona, 85043. An internet search indicates that Sunbelt operates seven brands in the listed states Amtex Corporation (TX), Indicom Buildings (TX), MR Steel (AZ), Phoenix Modular (AZ), ProMod Manufacturing (Ellaville, GA), Southeast Modular Manufacturing (FL), and Specialized Structures (GA).

9. Defendant Southeast Modular Mfg., Ellaville ("Defendant" or "Southeast") is a corporation engaged in the business of modular construction and manufacturing, with operations in Georgia, and has more than fifteen (15) employees, engages in interstate commerce and is covered by Title VII.

10. Southeast does business as ProMod Manufacturing at 603 South Broad Street, Ellaville Georgia, and the current General Manager is Claude (CJ) Yarbrough, who may be served.

11. According to information from the website of the Georgia Secretary of State for corporation registration and information, the Southeast Registered Agent for purposes of service is National Registered Agents, Inc., 289 S. Culver St., Lawrenceville, GA 300046-4805, in Gwinnett County.

12. MSouth Equity Partners acquired Sunbelt Modular, Inc. on August 15, 2022.

13. The Registered Agents for purposes of service of MSouth Equity Partners, is Wanda Morgan, TWO BUCKHEAD PLAZA, 3050 PEACHTREE RD NW STE 550, Atlanta, GA, 30305.

14. In November 2024, according to an internet search, MSouth sold its Sunbelt interest to Littlejohn & Co. LLC, a private investment firm in Greenwich, Connecticut.

15. The headquarters of Littlejohn is 8 Sound Shore Drive, Suite 303, Greenwich, CT 06830 Phone: (203) 552-3500

16. The Defendants are sued jointly and severally.

## III. FACTUAL ALLEGATIONS

**Initial Employment and Hiring Process Shows Plaintiff Has Significant Related Education and Manufacturing Management Experience in Accounting, HR and Wood and Plastic Product Management, and in August 2020 was Hired by Sunbelt to be the Accounting and HR Manager at a Plant Sunbelt Just Purchased, Southeast/ProMod in Ellaville, Georgia**

17. On August 24, 2020, Plaintiff was contacted by Robert Half Staffing Agency regarding an Accounting Manager position with Sunbelt Modular.

18. The position required a bachelor's degree, five years supervisory experience, five years accounting experience, and three years construction/manufacturing experience, all of which Plaintiff has achieved or completed.

19. On August 25, 2020, Plaintiff interviewed with Ron Procunier, owner and CEO of Sunbelt Modular.

20. The interview went well, and Plaintiff felt the company would be a good place to work under his leadership.

21. On August 28, 2020, Plaintiff participated in a final interview via Zoom with Sammy Watson and Joe Hall, the General Manager of the plant in Ellaville, Georgia, where she would be working.

22. For the two interviews with Southeast and Sunbelt agents, the Plaintiff had provided a CV with some of the following information about her education and experience, and during the interviews information like that which follows, was, or could have been

covered, so everyone knew that she was more than qualified for the position as Manager of Accounting and HR:

a. 29 years of manufacturing experience;

b. 37 years of Accounting experience;

c. 19 years of supervisory experience;

d. A bachelor's degree in Accounting and HR (December 2000, Georgia Southwestern State University);

e. Plaintiff was working towards an MBA when her father became ill and she dropped out to help take care of him.

23. During the interviews Plaintiff talked about her experience at Woodgrain Millwork as a Basecoat operator in 1982 on the production floor, before being offered a job in the front office, as an Administrative Unit Secretary.

24. Plaintiff had been going to school at night.

25. Plaintiff was one of the top producers in the production plant, and Woodgrain management recognized her ability and her work ethic and offered her an open position in the office.

a. 1982-1987 Plaintiff showed her computer skills by teaching herself to write programs and was soon promoted to the computer room where she was responsible for updating the payroll program, processing payroll, and preparing and distributing budgets;

b. 1985-1987 Plaintiff was put in charge of all PC Systems and Programs for Woodgrain;

c. 1987-1997, after writing a program for the Materials Manager Plaintiff was moved to the Materials Department where she was responsible for purchasing all inventory for production and managing the inventory process;

d. 1997-1998 Plaintiff was promoted to Accounting as a Staff Accountant;

e. 1982-1998 Plaintiff worked at Woodgrain for 16 years;

f. 1998-1999 Plaintiff worked at Albany Technical College as a Revenue Accountant;

g. 2000-2004 Plaintiff worked at Habitat for Humanity International

January 2005 management from Woodgrain started a new company, (Triwood) and asked the Plaintiff to join their team.

26. Triwood's name was later changed to Triwood Decorative Solutions after being purchased by Jacques Desmet, owner of Depro Profiles in Belgium.

    a. Plaintiff managed Accounting and Human Resources 2005-2014.

    b. Plaintiff was promoted to Controller/HR Director 2014-2015.

    c. Plaintiff was promoted again to CFO and remained over HR 2015-2018.

27. Plaintiff received particularly good evaluations during her employment at Woodgrain and Triwood.

28. Her direct manager Gerald (Bud) Forest gave her high praise.

29. In 2018 Jacques Desmet decided to sell Triwood and offered to sell the company to the Plaintiff.

30. Plaintiff could not get the needed investors, so Mr. Desmet sold the company to Woodgrain.

31. When Triwood was sold to Woodgrain in 2018, Woodgrain offered Plaintiff the position of Plant Manager for the Americus operations.

32. Plaintiff declined the position because she wanted to remain in HR and Accounting.
33. From approximately March 2018 until June 2018, Plaintiff worked directly for Mr. Jacques Desmet, the owner of Depro Profiles in Belgium, and previous owner of Triwood.
34. Plaintiff worked from home assisting Mr. Desmet in closing out liabilities that remained on the books for Triwood, and other tasks as assigned.
35. May 2018-June 2019 Plaintiff was approached by a friend who worked at a staffing agency, Southern Point Staffing, and asked if she could help them out.
36. They needed a controller.
37. Plaintiff met with the owners of the company who immediately hired her.
38. July 2019-September 2020, Plaintiff worked for Southwest Georgia Regional Commission, but the job was an hour drive, which was too much driving.
39. In late August 2020, while working for the government agency, Plaintiff received a call from a recruiter at Robert Half staffing regarding a position that was advertised as being with Sunbelt Modular.
40. In August 2020, during the hiring interview for Southeast, in which Hall participated, he displayed facial expressions that Plaintiff found concerning and negative.
41. In 2021, Plaintiff would ask Hall why he never asked any questions during the interview.
42. He acknowledged that he did not, and said, "because you answered all the questions I had."
43. Plaintiff was more educated and experienced in wood and plastics manufacturing management than Joe Hall, the White Male, who, for reasons challenged as discriminatory and retaliatory, would later undermine the legitimate job performance of a

Black woman, the Plaintiff, in her job as the Accounting Manager and HR Manager at Southeast.

44. After being offered the position by Sunbelt for the Southeast plant, Plaintiff requested and was granted a four-week period to provide notice to the government employer, Southwest Regional Commission, where she held the position of Director of Finance.

45. In early 2020, Sunbelt and Procunier purchased a plant in Ellaville, Georgia, previously owned by Southeast, called ProMod Manufacturing.

46. On August 25, 2020, Ron Procunier of Sunbelt interviewed Plaintiff to become the Manager of the Accounting and HR departments in Ellaville, Georgia. Plaintiff's education and high-level accounting, HR, and computer/IT experience in wood manufacturing impressed Procunier, who believed Plaintiff could help Sunbelt bring Southeast to operate as desired, creating a soundly operating company to attract investors.

47. Three days later, Plaintiff interviewed with Sammy Watson and Joe Hall, the White General Manager, who asked no questions and who later became the source of racially hostile treatment.

48. Plaintiff was hired in August 2020 but did not start until September 2020.

49. During her employment, Plaintiff reported directly to and was supervised by Sunbelt's Chief Financial Officer: first an interim CFO, then Don Whitehead from early 2021 through late summer 2022, and finally Bob Lahmann.

**Ongoing Issues During Employment**

50. Joe Hall, the White General Manager in Ellaville, engaged in prohibited race and gender discrimination and retaliation.

51. Beginning around July-August 2023, he used his White employees and friends to influence Ms. James (the only other African American on the administrative side in the office besides Plaintiff) to complain to Lahmann.

52. There were 16 employees in the office and 12 were White and four Black.

53. Of the Managers, including Hall, six 6 managers were White, and Plaintiff who is Black.

54. These complaints falsely attributed various problems to Plaintiff, when the root causes were actually: Sage (a new computer program for payroll and accounting selected by Sunbelt) causing payroll delays, and HR staffing shortages requiring Plaintiff to perform clerical functions in addition to upper-level accounting and HR management, causing Plaintiff to work excessively.

**October 2023, Surprise Sham Evaluation by Lahmann, Sunbelt CFO and Protected Objections by Plaintiff about Discrimination and Hostile Treatment—Neither Investigated nor Acted Upon by Lahmann, Sunbelt CFO**

55. In October 2023, Lahmann came to Ellaville and surprised Plaintiff with a meeting about an Employee Survey that was being used as a sham evaluation.

56. The survey was subjective and anonymous (and therefore suspect), completed by Hall and/or the Whites under Hall's control, and perhaps Ms. James (also under Hall's control).

57. Lahmann presented this survey as if it were an Employee Evaluation, but this process and use of the Survey deviated from accepted practice, since proper employment evaluations at Sunbelt and Southeast and are to be conducted by one's supervisor(s) using an Employee Evaluation form that allows for rebuttal, areas of improvement, plans for improvement, and other process for a meaningful HR process.

58. Plaintiff made protected complaints to Sunbelt CFO Lahmann about prohibited discrimination and hostile treatment driven by Hall that was adversely impacting both Plaintiff and the Ellaville plant.

59. Lahmann's only response was to ask why Plaintiff did not just quit, and he did not investigate nor take any reasonable action to end the prohibited discrimination.

**Post-October 2023 Developments Showing Hall was Making Moves Anticipating Plaintiff's Termination, which Would Occur in February 2024**

60. After October 2023, Tina Powell, White, who was a longtime friend of Hall and who worked for Hall, began training someone Toby Sexton, a White man and relative of another White employee, Rufus Yarbrough Jr., and relative of CJ Yarbough, close friend of Hall; with CJ becoming the General Manager, by an internal promotion, after Hall was promoted, to a District position.

61. Sexton was hired to do Tina's job in preparation for taking over Plaintiff's position.

**December 2023 Phoenix Conference, and Plans to Terminate Plaintiff After Her Protected Objections in October 2023**

62. There was a company conference in Phoenix attended by Hall, Lahmann, and Procunier, which provided an opportunity for them to discuss matters outside of Plaintiff's presence.

63. Upon information and belief, by then or at least before February 2024, Lahmann had informed Hall and Procunier that Plaintiff had complained about Hall's discriminatory and hostile treatment.

64. Hall convinced Sunbelt's Procunier and Lahmann to terminate Plaintiff, or alternatively all agreed, or just Hall and Lahmann agreed, which would occur through Lahmann in February 2024.

65. From the time Hall returned from the conference in December 2023 through the termination in February 2024, Hall was cold towards Plaintiff.

66. Tina Powell continued to train Toby Sexton, a White male, to do her job of Project Coordinator and helping Joe.

67. Toby is a relative of CJ Yarbrough (Purchasing Manager, now General Manager) and Rufus Yarbrough, Jr. (Manager Shipping, Receiving and Safety), both White males.

**February 7, 2024, Termination**

68. Between the October 2023 meeting with Sunbelt's CFO Lahmann and the sham use of the subjective, and orchestrated Employee Survey, and February 7, 2024, the day of termination, no one gave Plaintiff notice of anything to correct.

69. Hall and Lahmann, and probably Procunier, knew Plaintiff was doing two jobs and that Morgan Benning was being trained to do HR payroll, FMLA, garnishments, etc.

70. However, Sunbelt CFO Lahmann came to Ellaville to terminate Plaintiff without any notice of need for correction, and of course without any prior warning of termination.

71. When Plaintiff asked why CFO Lahmann was terminating her, he initially said he could not tell her.

72. When Plaintiff pressed, saying "You are terminating me and you can't tell me why," Lahmann then said it was late AP's (accounts payable) and late payroll, which were false reasons, because employees and vendors were being paid on time, and there had been no write-ups for something as important as that if it were happening.

73. Lahmann gave no evidence of late AP's or late payroll, then, having the hollow and suspect reason exposed, shifted the reason to another hollow reason that the decision had

already been made, without providing a real reason or notice of what performance was defective.

74. As he left, Lahmann said he was sorry.

75. For the rest of the day, other employees noticed Lahmann visibly shaking.

**Strategic Timing of Termination Showing Hall's Knowledge and Involvement**

76. Joe Hall strategically delayed terminating Plaintiff until after Plaintiff had completed two critical tasks: First, Plaintiff oversaw the correction of the new payroll system using Sage software, which Sunbelt had required Plaintiff to implement; and, second, Plaintiff established compliant HR operations necessary to attract investors, which included: ensuring FMLA compliance, organizing I-9 documentation, straightening out employee files, managing garnishments, handling child support matters (which had tripled in volume), processing W-9's for vendors, creating HR employee discipline and training forms, implementing health questionnaires for all employees, developing a sales tracking report for Joe, and creating weekly sales projection graphs.

**Transition Arrangements with Hall Having Tina Powell, White, Train Toby Sexton, White, for Tina's Job, to Enable Hall have Tina to Slide into Plaintiff's Position After Plaintiff Has Made the Position Tenable and After the Challenged Termination of Plaintiff**

77. Plaintiff was training Morgan Benning to do payroll and all deductions (garnishments, child support, etc.) and teaching her how to interview employees, and what to say and not say.

78. Tina was training Toby Sexton to do her job, so that Tina could step in as Accounting Manager, where Plaintiff had set up the systems, and the software managed most of the accounting management (accounts payable was being done by Ms. James).

79. Plaintiff had been hired to manage Accounting and HR operations at Ellaville, and there was no one doing day-to-day HR work because qualified people could not be found and sustained until Ms. Benning, who had no experience but was trainable.

80. Without adequate staffing and the software that was not working correctly, Plaintiff had to work extraordinarily long hours doing manual entry of HR payroll and related deduction information.

81. On the day Plaintiff left, Tina took over Plaintiff's job.

82. Shortly after Plaintiff left, Morgan Benning also left.

83. The software problems that had plagued the accounting system had been corrected while Plaintiff was in charge of accounting.

**Alternative Legal Theories About Deciding Official**

84. Joe Hall, the White General Manager for Southeast in Ellaville, used Lahmann and Sunbelt as a pawn to terminate Plaintiff on grounds prohibited by law based on race.

85. In the alternative, Lahmann came to Ellaville to terminate Plaintiff without proper investigation and without following the usual practice of notice of discipline or correction.

86. Lahmann refused to ask about Plaintiff's position because he knew there had been problems out of her control, which she continued to oversee until corrected.

87. The termination was a pretext for adverse treatment based on race, gender, and retaliation.

**Corporate Structure and Control**

88. From the time of Plaintiff's hire in 2020 through her termination in February 2024, Sunbelt directed the management level activities of Southeast, including Plaintiff’s tasks

to oversee installation and operation of Sage, software being installed for in-house use, for accounts payable, timekeeping, payroll, deduction, garnishments, etc. and HR policies and compliance with employment law, FMLA and immigration, to make Southeast into Sunbelt company.

89. Ron Procunier owned Sunbelt and directed the purchase of Southeast.

90. Procunier had Southeast employees Hall and others hire Plaintiff.

91. Plaintiff reported directly to Bob Lahmann, Sunbelt CFO.

92. Sunbelt hired plaintiff to go to the Ellaville plant of Southeast and implement changes that Sunbelt directed and wanted.

**Hall Took HR Staff, Qualified HR Staff Were Hard to Find in Ellaville and Time Consuming to Train and Hall's Mistreatment of Plaintiff on Account of Race and Gender Created a Hostile Work Environment**

93. On September 28, 2020, Plaintiff began employment as Accounting Manager with two direct reports: Denise Brown (White) and Tina Powell (White).

94. Plaintiff immediately observed that while there were many people of color working in the plant in production, where the manual labor was performed, there were no persons of color in the office at that time where the administrative and management staff work.

95. Almost immediately after Plaintiff started, Joe Hall created a new position for Tina Powell, and removed Powell from supervision by Plaintiff, which began the process of Hall teaching his White friend, Tina Powell, the process to replace Plaintiff, who was Black, with Powell, who is White, like Hall.

96. This left Plaintiff with one direct report, which created an immediate staffing shortage and performance impediment, that handicapped Plaintiff's ability to effectively accomplish the management duties as they were assigned to her by Sunbelt.

97. Sunbelt, the corporate office, and whoever was the CFO, of the three who served during the material time, knew what duties would be required of the Plaintiff, but allowed Hall to move Powell out anyway.

98. Between the time of the August interview and starting, or at any time, no one from Sunbelt told Plaintiff that one of Plaintiff's two direct reports for accounting and payroll**,** who Plaintiff counted on to perform duties under Plaintiff's supervision, would be moved out immediately.

99. Plaintiff worked a month before finding a replacement for Powell, who Hall had moved to work directly for him, which had an adverse impact on the terms and conditions of Plaintiff's job:

a. October 2020 -- November 2021 Plaintiff hired Mandy Hobbs. She was quarantined for COVID exposure during the month of August 2021. In November of 2021 Joe Hall reported to Plaintiff that Mandy Hobbs told Tina Powell that she (Hobbs) felt the company had treated her best friend, Rebecca Alicea wrong, and was encouraging Alicea to file a lawsuit against the company.;

b. Mandy Hobbs was the receptionist, who answered the phone, greeted guests and assisted Denise Brown with time-keeping duties, as Denise Brown was starting to take on the full role of Accounts Payable. Hobbs would sometimes work late or work the weekend to assist Plaintiff, but only when she could;

c. April 2021, Plaintiff documented that Denise Brown was making too many mistakes in accounts payable ("AP "), such as entering invoices under the wrong vendor or selecting the wrong vendor for payment. Every week Plaintiff had to rerun

the AP check selection due to mistakes made by Brown. This caused Plaintiff about an extra two hours a week to correct;

d. November 2021 -- January 2022, Plaintiff worked alone with one direct report;

e. January 2022, Denise Brown was out after testing positive for COVID. During the month Plaintiff was able to find two temporary employees, Bobby Chavis, African American, and Alegtha (Lisa) Ms. James, African American. It was a struggle trying to manage duties of two full-time jobs while training two temps;

f. March 2022, Denise Brown left the company;

g. In June 2022, Chavis and Ms. James were hired as full-time employees. Chavis had to be terminated because he was transposing numbers, names and spelling of names. He left at 5:00 pm every day. The job required someone who could do the details correctly;

h. There were many projects that needed to take place to get the personnel files in order with HR guidelines. The last straw was when Chavis failed to pull employees from the plant when their I-9 credentials were not validated. Plaintiff found this after checking his work;

i. Around September 2022, Chavis was terminated;

j. This left Plaintiff with one employee, Alegtha (Lisa) Ms. James. Hall and his group of other White employees would start to use Ms. James, who is Black, to side against Plaintiff. Plaintiff only learned of this later when she and Ms. James grew closer;

k. Around September 2022 -- January 2023, Plaintiff was understaffed again;

l. January 2023, Plaintiff hired Laura Owens. After Laura was hired Plaintiff discovered that Owens was falsely told by Hall that Plaintiff was retiring soon and

that she would take Plaintiff's place, where Hall was already taking steps to remove Plaintiff, the Black Woman hired by the owner Ron Procunier from power and insulate the office with White managers. Shortly thereafter Plaintiff advised Owens that she, Plaintiff, did not plan to retire anytime soon;

m. Owens had goals of being a manager and was disappointed that Plaintiff was not retiring soon. Owens would get angry when she had to first check with Plaintiff, Duane Berry (Production Manager), or Joe Hall about making decisions. Without talking to Plaintiff, Laura Owens soon found another job and left the company, leaving Plaintiff short-handed;

n. May 2023, Laura Owens left the company;

o. May 2023 -- July 2023, Plaintiff was working with one employee again, and a college student. There was still protected medical information in the personnel files. There were some employees who did not have personnel files. The I-9 immigration binders also needed to be audited. It was a large project;

p. July 2023 -- Morgan Benning was hired for the HR/Payroll role;

q. August 2023 Benning's mother passed away. Plaintiff stayed in touch with Morgan after her mother died until she returned to work;

r. August 2023-February 2024-Training Benning to take on the full HR role. Benning expressed that she did not know how Plaintiff was doing all of the work she, Plaintiff, was doing. The HR role itself was so time-consuming and important that Benning struggled for a while, and Plaintiff could see it;

s. Benning and Plaintiff discussed what was bothering Benning. After this confidential conversation, Plaintiff tried to slow down the shifting of duties to

Benning, even though Benning was grasping the job, because Plaintiff did not want to drive her away.

**August 2023 -- October 2023 Benning shared with Plaintiff that Ms. James was saying negative and disparaging things about Plaintiff.**

100. Benning told Plaintiff that Ms. James was saying negative things about Plaintiff, but Benning knew that none of it was true because she knew Plaintiff and that the comments were disruptive to the business and were undermining Plaintiff's plans and authority.

101. Sunbelt, the parent company, was aware of the many audits that would be imposed on the newly purchased plants, to which Plaintiff had to respond for Ellaville, while dealing with a staffing issue and the computer problems stemming from the new software.

102. Sunbelt also knew the specific details of the job requirements that had not been provided to Plaintiff prior to hiring her and having her essentially start departments in a local plant where before these administrative and managerial functions were being done at a central office.

103. Sunbelt knew how long the additional task would take because Sunbelt's staff were already performing the tasks that were being shifted to the plant in Ellaville.

104. From the outset the General Manager, Joe Hall, a White Male, about 50 years of age, made his resentment clear, telling Plaintiff he did not have any say-so in hiring Plaintiff "because Ron wanted Plaintiff and he just had to accept it."

105. Hall had control of day-to-day operations in Ellaville and began to abuse his power to make Plaintiff look bad and try to drive her out, while trying to cover his unlawful intent.

106. He revealed that he did not like it that "Sunbelt paid Robert Half (the staffing agency) $18,000 to get Plaintiff there."

107. Hall expressed anger that he was "no longer calling the shots."

108. Approx 2021-2022, Hall also expressed anger that he no longer had access to financial statements.

109. The all-White management staff, consisting of close friends and some related individuals, made it clear they did not want Plaintiff telling them what to do, even though Plaintiff oversaw Accounting and HR.

110. This was apparent by openly defying her and by not wanting her to be included in matters involving employees which should always involve HR.

111. Claude Yarbrough did not want Plaintiff giving him directives from Sunbelt regarding purchasing process changes, and would get angry and yell at Plaintiff that he was sick and tired of all the changes and wanted her to get out of his office.

112. During a visit from the previous CFO, Don Whitehead and Ibet Murillo in 2021-2022, the Safety manager, Rufus Yarbrough Jr. was openly upset and defiant because he did not feel that HR should be included in safety matters.

113. Mr. Whitehead and Ms. Murillo had to tell Mr. Yarbrough that there is a direct relationship between HR and Safety, but Whitehead was angry about this.

**Systematic Denial of Training and Support for Plaintiff's Duties**

114. Sunbelt had acquired plants in other locations Southeast, Leesburg Florida and Specialized Structures in Douglas Georgia had long-term personnel in place for accounting and personnel, and they had received proper training, but Plaintiff had to start from scratch in the Ellaville plant, and was without adequate support.

115. Southeast was not offering FMLA at all, even though required by law to be offered.

116. Southeast was not reporting immigrant information to the required agency, Georgia New Hire, and there was no I-9 reporting, although required by law.

117. Southeast in Leesburg had Suzie Nelson, an employee in charge of HR, who had worked in the Leesburg office for over 10 years, and Leesburg had an Accounting Manager, Phillip Vanhusen, who had been with Southeast, Leesburg for over 10 years.

118. The person in accounts payable in Leesburg, Patti Friberg, had been with Southeast in Leesburg for three to five years.

119. Nelson, Vanhusen, and Friberg had been managing all of the accounting and payroll for Southeast Ellaville, Georgia, and Specialized Structures in Douglas, Georgia.

120. Southeast in Ellaville had no access to the General Accounting computer modules to help with efficient accounting.

121. Southeast in Ellaville only had limited Accounts Payable access.

122. Plaintiff had to be given access to the General Ledger, Accounts Payable, Accounts Receivable, and Payroll modules.

123. Don Whitehead and Ibet Murillo also had to select all parameters to be used within these modules.

124. In about 2021, Plaintiff discovered that Denise Brown had been given access to pay data, which Brown should not have had.

125. Plaintiff discovered this after having to use Brown's computer to assist her with another matter.

126. Corporate trainer Ibet Murillo was supposed to train Plaintiff on Sunbelt's accounting procedures, but before she could start Plaintiff's training, "something happened at corporate and she had to go back to Phoenix," leaving Plaintiff in the inefficient and time-consuming position to figure everything out on her own, without the intended training.

127. The Ellaville plant was not properly set up in Sage accounting software, for billing, time keeping and accounts receivable, to which the company and the plant were moving, after ending the relationship with ADP, that performed all of those functions as an outside contractor.

128. When the internal accounting software of Sage was instituted, most options either did not work at all, or did not properly, which made Plaintiff's job difficult and time consuming because Plaintiff had to stop and try to figure out what was wrong with the Sage program.

129. Sometimes Plaintiff would have to call Sunbelt for assistance.

130. During 2023, the IT manager, David Sousa (Sunbelt IT Manager) had the Sage Programmers run a program that caused the first 10 to 15 payroll checks to post three to four times.

131. The Sage Programmers needed to get it fixed before the next payroll run, but it took them several weeks to figure it out.

132. In the meantime, Joe Hall was complaining that his paystub was wrong, as if Plaintiff had done something.

133. After Sage Programmers told Plaintiff that the issue was fixed, Plaintiff checked behind Sage Programmers, only to find out that it was still incorrect.

134. David Sousa had to call the Sage programmers again.

135. While this kind of programming issue and everyday interruptions were occurring Plaintiff , who was in Accounting and HR locally, was having to take calls from, and call the IT Manager, David Sousa, because she was the onsite contact for computer problems.

136. If the server went down, she was the main contact to figure out what was wrong and facilitate getting it fixed.

137. Sometimes this would mean restarting the server, calling the broadband service provider, or assist in troubleshooting.

138. Plaintiff was not hired to be IT for Ellaville.

139. When the company transitioned from ADP (a payroll processing company), an independent Sage contractor, Michael Summy, hired to oversee the transition to in-house payroll did not properly set up the Southeast program to process payroll.

140. When the Plaintiff reported this to Summy, he looked at the system and said that he had set it up the same as the other locations.

141. Although the Plaintiff insisted that there was a problem, Michael Summy, the independent Sage contractor, told the trainers at Sunbelt that it was set up the same as the Leesburg and the Douglas location.

142. This statement was not true and added time to correct the already grueling process.

143. Months later, Ibet Murillo from Sunbelt, would understand that Plaintiff was right.

144. In order to fulfill the company's duty to timely pay employees, because the Sunbelt/Southeast software was not efficient and sometimes did not work at all, Plaintiff had been unnecessarily manually keying direct deposit information into the banking system, which should have been automated through the payroll functions; which prevented Plaintiff from doing management tasks for Accounting and HR.

145. The Plaintiff had to manually enter information about 100 plus employees into the direct deposit module of Huntington Bank.

146. Plaintiff complained to Argelia Gonzalez, the HR/Payroll person for Sunbelt and David Sousa, the IT Manager for Sunbelt in 2023, that the payroll process itself was taking over an hour to run, when that should have taken only 5 to 10 minutes.

147. They could not tell her why it was taking so long to process.

148. The other Sunbelt locations were processing in about 5 to 10 minutes.

149. The Plaintiff called Nancy Davis, the Accounting Manager at the Leesburg, Florida location, to find out how long it took their payroll to process.

150. Nancy told the Plaintiff that it only took a few minutes.

151. It would take the processing for Southeast in Ellaville over an hour to process.

152. Sunbelt trainers for Sage spent at least a day at each of the other facilities during the conversion from ADP to Sage.

153. Training at the other facilities began early in the morning.

154. However, Sunbelt trainers did not get to Ellaville until the last day of training in the afternoon, and only spent a couple of hours with Plaintiff.

155. Plaintiff was forced to manage multiple roles simultaneously, spending about 80% of the time handling HR (Recruiting, Employee Relations, Benefits, computer issues, payroll deductions like garnishments, child support, and insurance).

156. These are tasks that should have been managed by the HR person, but it was hard to fill that role, and there was no one in that role for extended periods.

157. From 2021 to 2024 Plaintiff was working late at night and on weekends.

158. Because she was doing these two jobs, Sunbelt CFO Don Whitehead approved/changed her title to Controller/HR Manager.

159. During her time at Southeast, while managing two jobs, for much of the time, she also managed audits for the last quarter of 2020, and for each quarter of 2021, 2022, and 2023.

160. There were two audits for each period, which require being able to justify or show expenses and payments, for the focus of each audit, which includes compliance with law; one by the accounting firm of Moss Adams, and one for the bank, Huntington Bank.

161. During her employment the company also grew from roughly 65 employees to almost 200.

162. The child support deductions more than tripled and the garnishments increased.

163. This also meant that insurance deductions increased and had to be calculated, set up, and entered into the payroll processing system and the insurance system.

164. The Plaintiff was managing all of this, in addition to all other tasks for Accounting and HR while trying to facilitate audits.

165. Sunbelt knew that the workforce growth at Southeast in Ellaville was substantial, yet CFO's Don Whitehead and Bob Lahmann failed to offer the requisite support.

166. The growth benefitted Sunbelt and Southeast financially, yet Southeast and Sunbelt substantially failed a management employee with a broad base of knowledge and skills, beyond and different from those of anyone else assigned to the plant in Ellaville, putting her in a situation that in which she had to correct the mistakes that come with systemic change, especially computer software change, and a shortage of persons competent to perform the tasks demanded by the software and law.

167. Sunbelt stood by and watched it happen, and then participated in Hall's discriminatory and retaliatory termination, and set up a sham evaluation process to cause the termination, with the involvement of individuals, who also can be liable for these acts.

168. Sunbelt and Southeast used the Plaintiff to work her far more hours to set up and de-bug all of the systems that they were implementing in Ellaville, all of the while, preparing the White woman to replace Plaintiff, who would then have an eight hour a day job.

169. Powell received annual evaluations and yearly increases, but Plaintiff received no evaluations or increases.

170. Plaintiff's last annual bonus for the year of 2023 was $8000, while the bonus for Tina Powell the White friend of Hall, where neither of them had the experience and education to implement the plan required by Sunbelt and the law, and Hall received a $12,000 bonus, determined by Hall.

171. Powell was leaving everyday around 5:00 pm, while Plaintiff worked late every day.

172. When Plaintiff was finally seeing relief and could work normal hours, with the help of the new HR person, Morgan Benning, and Plaintiff had worked out most of the issues with the systems, Defendant, through the impetus of Hall, replaced Plaintiff with Tina Powell.

**Technical Sabotage and Discriminatory Treatment**

173. During the transition from using ADP, an outside contractor to do payroll and other accounting for a fee, to doing the accounting and payroll in-house using Sage software that Sunbelt purchased to do the payroll and accounting in house, Plaintiff was forced to manually enter the information for every single employee into the banking system to be paid each week for several months, while other Southeast/Sunbelt locations were able to upload theirs in a split second.

174. When Plaintiff reported this problem to the Sage Programmer, Michael Summy, he dismissed her concerns.

175. Michael Summy said that he set up the Plaintiff's system the same as Southeast in Leesburg, Florida.

176. The Plaintiff reported the problems to Joe Hall, Argelia Gonzales, and Ibet Murillo.

177. Even though Hall knew that Plaintiff was not responsible for making Sage work correctly, when she would go to Hall with information that there were software problems, Hall never responded with any possible solutions, how to request or pressure Summy, or someone else to resolve a problem that was causing terms and conditions of employment for Plaintiff that were not part of her job, and requiring long and late hours to repeatedly do manual input, which the software was intended to eliminate.

178. Hall's indifference was intended and did subject Plaintiff to more difficult and time-consuming, adverse terms and conditions not a part of Plaintiff's agreed upon job, was more adverse than those doing similar work in other plants, and was far more adverse than Powell would have to do after Hall and Sunbelt would unlawfully terminate Plaintiff, and Hall would put his White friend Tina in Plaintiff's job.

179. Whenever Plaintiff went to Hall even about personnel problems of which a General Manager should be aware if not aid in correcting, through imposition of his title behind a decision, Hall did nothing to relieve Plaintiff, and Sunbelt/Southeastern for that matter, leaving Plaintiff in a situation he knew was adverse.

180. When Sunbelt CEO Ron Procunier would come to Ellaville to inspect and supervise, he would talk to Hall, and it is reasonable, given the totality of the circumstances, to believe that when Procunier met with Hall, and Procunier would ask about problems, and if there were real problems about Plaintiff's performance, Hall would have mentioned it to Procunier.

181. Many times Procunier would walk through the part of the building and office where Plaintiff and her staff were and laugh, and ask if Plaintiff had something on Hall, as a way of referencing the fact that Hall was allowing Plaintiff to purchase necessary office furniture, decorations, and other office supplies without any pushback.

182. After meeting with Hall, Procunier would meet with Plaintiff and talk about operations and ask how things were going, and then have a pleasant conversation with Plaintiff, but Procunier never mentioned an allegation that accounts payable or payroll was late.

183. Similarly, Bob Lahmann would come to Ellaville and meet with Hall, and then come to talk to Plaintiff, and he never mentioned that accounts payable were not getting paid or that payroll was late.

184. In the October 2023 meeting with Lahmann and the sham evaluation using the Employee Survey, in deviation from accepted process, indicating pretext, Lahmann did not bring up that accounts payable were not getting paid or that payroll was late.

185. The only time Lahmann brought that up was on February 7, when he terminated Plaintiff, and was pushed for a reason, when he had none to offer at first, and then he backed away from that, and just said a decision had been made.

186. Plaintiff made sure payments were made by due dates and in fact paid many early and as a result some vendors would give discounts.

187. Hall's real concern about making payments to vendors was that he wanted checks that needed to be signed, to make sure that they were given to him on Thursday so that he could sign the checks Thursday, so that Hall could be off Friday altogether, or leave early, and play golf, with some of his White friends from the office: Jackson Benjamin, Dean Long, and Joshua Mattson.

188. Hall never asked Plaintiff to go play golf.

189. When Plaintiff worked at Triwood, owned by Jacques Desmet, the White male managers took her to play golf.

190. Ron Procunier must have never been told that the accounts payable or payroll were late, and so when Plaintiff was told by Bob Lahmann that was the reason she was being terminated, Defendants knew that was false.

191. In about early 2023, Hall repeatedly tried to convince Plaintiff that he and Procunier were tight and friends, to chill Plaintiff from raising concerns about Hall with Procunier.

192. Plaintiff had complained to Ibet Murillo with Sunbelt, to get her to talk to the Sage independent contractor, Michael Summy, and he assured Ibet that it was set up properly.

193. Months later, Ibet Murillo discovered Plaintiff was correct and logged into the Ellaville location and fixed the problem.

194. In about 2021-2022 Plaintiff discovered that the payroll taxes had been under paid because Plaintiff's direct Sunbelt manager, Don Whitehead, a White male, put a decimal point in the wrong place for tax calculation.

195. At some point between 2022-2023 Ibet Murillo, Argelia Gonzalez, and Plaintiff discussed if someone were trying to sabotage Plaintiff's work, because there were too many technical problems that could not have been the result of anything Plaintiff had done.

**Hostile Work Environment and Racial Harassment**

196. Joe Hall actively turned the office staff against Plaintiff, creating a climate of resentment toward Plaintiff that undermined her supervisory authority, which Hall did to create a sham record of performance issues or to run Plaintiff off, for reasons connected to race, gender and retaliation.

197. Hall would share his personal feelings of disdain with his staff, of whom all were White, who would then take on the position of their boss, who controlled their job security and conditions, like pay and bonuses.

198. When Hall was angry with some incident or condition in the least connected to Accounting or HR, which also covered and impacted persons in the manufacturing part of the pant, Hall regularly used profanity including the F-word, directed at Plaintiff, speaking loudly enough for others to hear, as a public show of his authority and racial superiority and hostility toward Plaintiff, which over time caused severe emotional distress, from which she continues to suffer, and will continue to suffer into the foreseeable future, which impacts her ability to work.

199. In addition to the substance and volume of his speech as a way of gauging Hall's anger, Plaintiff could tell when Hall was angry because his face would turn bright red.

200. In about 2023 during one incident over vendor documentation, like W-9's and other information to be used in the software to facilitate payment, , , Hall walked away while yelling, "I'll just tell him to come to you [referring to Plaintiff] and sign the "F*ng" form!!!"

201. Once Hall used this same tactic in the presence of Ms. James and a plant supervisor, Terrence Cook, and Cook did not hear him, but Ms. James did.

202. Plaintiff, Ms. James, and Cook were discussing one of the hourly employees who was not doing his job, Hall said something to the effect that this employee was not the only one not doing their damn job.

203. Plaintiff asked Ms. James if Hall were talking to her (Ms. James) and Ms. James said, she thought Hall was talking to Plaintiff.

204. Hall would become angry with Plaintiff when Sunbelt made changes that he did not like.

205. In 2021-2022, Hall became angry when Sunbelt told Plaintiff not to share financial statements with Hall.

206. Hall did not speak to any White office administrator or manager with profanity as emphasis for his anger.

207. Hall used profanity to demean and cause stress to Plaintiff., but other Americans like Ms. James, or a plant employee, who was present and heard him, also felt the stress and racial hostility.

208. Plaintiff was told by Black men working labor in the plant that Hall constantly used profanity to them, when he gave directions or expressed anger about something that occurred in the plant.

209. During 2022-2023 several young Black men, between 20-30 years old, came to Plaintiff to complain about the hostile and demeaning way Hall addressed them.

210. Two left the compnay the same day they made the complaints, wasting the Sunbelt/Southeast investment in training they had, and the other was terminated because he used profanity right back in response to the mistreatment.

211. Whenever Joe Hall saw anyone in Plaintiff's office, he would become angry and make comments about employees being in Plaintiff's office, because he knew they were likely making a complaint about other managers or him, because Plaintiff would go to Hall to inform him of problematic situations, not necessarily under her control.

212. Joe Hall showed particular anger when Black employees sought Plaintiff's guidance.

213. Plaintiff could see Hall walk to the door and turn around and walk away.

214. In about 2023, Hall saw Terrence Cook (a Black supervisor), talking to Plaintiff and he turned and walked away.

215. He came back later and said that he had stopped by to see Plaintiff, but someone was in Plaintiff's office.

216. He used a tone that let Plaintiff know he was not pleased.

217. From September 2020 through December 2020, when Plaintiff attempted to share her manufacturing experience of 29 years to help the company, Joe Hall would become angry and tell her he thought she was "arrogant" and was "boasting" about her resume.

218. In early 2021, the Leesburg office had not transferred all of the accounting duties to Ellaville.

219. Because all of Plaintiff’s duties of implementing the software changes were not yet occurring, Plaintiff offered to assist Joe Hall with production by creating reports, or to do anything else with which she could see that assistance was needed.

220. Plaintiff shared her experience including the fact that Woodgrain had offered her a role as Plant Manager and Hall accused Plaintiff of boasting about her resume and called her arrogant.

221. Plaintiff's accounting education and experience with accounting related to production, and HR relating to management of production employees provided the credentials and knowledge to be a General Manager.

222. Plaintiff was as qualified or more qualified to be a General Manager than Hall.

223. However, Plaintiff was hired as and was performing as Accounting and HR Manager.

224. No one from Sunbelt informed her she was only there to set up the Ellaville plant to follow the law in HR and accounting, and the new accounting software was running relatively smoothly.

225. No one from Sunbelt had her sign a contract that limited the term of her position to when Ellaville complied with the law and Sage was operational.

226. No one offered her that job or another when Powell was given Plaintiff's job.

227. Plaintiff had worked in HR for 15 years before working at Southeast.

228. In 2022-2023 Plaintiff advised Manager Hall to change a situation involving applicants in the front lobby that appeared to create racial disparity.

229. Hall told Plaintiff, "I don't care what the law is. No one is going to tell me how to run my plant."

230. It was not his plant, and individually, and "his plant," owned by Sunbelt, were subject to laws about discrimination in contract and employment, but Hall malevolently disregarded the law, and demeaned Plaintiff while doing so.

**Discriminatory Compensation**

231. Throughout her employment, Plaintiff never received pay increases that could be granted yearly, despite positive feedback and working almost every weekend since starting, but similarly situated White Male manages, did, as well as did Tina Powell who replaced Plaintiff.

232. Plaintiff did not receive proper or any real evaluations, but similarly situated White Male manages, did, as well as did Tina Powell who replaced Plaintiff.

233. Given that Ms. Powell received a yearly bonus that was several thousand dollars more than Plaintiff's bonus in 2023, and that Plaintiff never received a legitimate evaluation or

a yearly bonus, and the White managers were receiving evaluations, it is plausible that White managers were receiving yearly increases in salary and Plaintiff was not, which will plausibly be shown through discovery.

234. In approximately 2022 Plaintiff was told by Ron Procunier, the owner of Sunbelt who bought Southeast, that Plaintiff must have been doing a good job because she was selected for the corporate bonus; which was given to only one person from each plant.

235. But, Hall and Plaintiff's direct line supervisor Sunbelt CFO Lahmann and his CFO predecessors, never gave Plaintiff a legitimate evaluation nor yearly increase.

236. Before Plaintiff started asserted herself in HR matters, in 2022-2023 and opposed Hall's discriminatory treatment of her through her discussion with Lahmann in October 2023, Hall selected Plaintiff for a corporate bonus in 2021-2022, to keep her inspired to continue the hard work, to bring the plant he managed into compliance with the law and the wishes of Sunbelt, where the ultimate benefactor of Plaintiff's skill and hard word work would be Hall and Sunbelt.

237. Since Plaintiff's termination is February 2024, Sunbelt, and whoever is the controlling entity, through Procunier, has promoted Hall to a district position, and increased his pay substantially, an amount within the knowledge of Defendants, and capable of determination through discovery.

238. Upon information and belief, the process to select the new General Manager, skipped an open and fair public application or search process, and was a preselection of CJ Yarbrough, a Whtie male and Hall's close friend.

239. Plaintiff was not offered the position, nor even made aware of the opening, and yet she was far more qualified than Yarbrough.

240. While the following White male managers consistently received evaluations and yearly pay increases, Plaintiff never received an evaluation or pay increase:

a. 2021 and 2023, Claude Yarbrough, Purchasing Manager, received evaluations and pay increases.

b. 2020, 2021, and 2023 Dean Long, Sales Manager, received evaluations and increases

c. 2020 and 2022, Rufus Yarbrough Jr., Safety/Shipping and Receiving Manager, received evaluations and increases.

d. 2023 Matthew Murphy, Engineering Manager, received an evaluation and an increase.

e. 2022 and 2023 Donald Berry, Production Manager, received evaluations and increases.

f. Plaintiff's evaluation should have been a collaboration between Joe Hall and Bob Lahmann.

g. In 2022 Plaintiff was selected to participate in the yearly corporate bonus which is only given to those who are doing an outstanding job, according to Joe Hall and Ron Procunier, yet Plaintiff still did not receive an evaluation or pay increase in 2022.

**Use of African American Employee Against Plaintiff**

241. Joe Hall and some of those in his group of friends, who are all White; Dean Long, Claude Yarbrough, Rufus Yarbrough Jr., and Tina Powell, began using Alegtha (Lisa) Ms. James, an African American temporary employee (who was eventually hired) to undermine Plaintiff.

a. Whenever Ms. James was upset because of a decision made by Plaintiff, her direct manager, Ms. James, would complain to Tina Powell, as Ms. James and Powell became friends. Tina Powell, a White female who now has Plaintiff's old job, would share Ms. James' complaints to Joe Hall, who would say negative things about Plaintiff to Powell, and others who reported to him. Soon Ms. James would begin repeating these negativities to other employees, including those hired by Plaintiff. Ms. James knew the information was not true but repeated it anyway. Plaintiff knew this because Plaintiff's last HR hire, Morgan Benning, a White female, told Plaintiff. Benning came to know Plaintiff instead of listening to office gossip, so Ms. Benning knew that none of what was being said was true.

b. Hall and Plaintiff made the decision to hire Ms. James permanently around June 2022, and Hall continued to talk negative about Plaintiff to Hall's group of White employees who would then talk negative about Plaintiff to Ms. James, who would then repeat the negative comments to other employees who were hired later. Some of the other employees, like Morgan Benning and Laura Owens, would eventually tell Plaintiff.

c. Ms. James would tell Plaintiff that "they" (referring to Hall and White employees) did not like Plaintiff, and "they" were encouraging Ms. James to call Plaintiff's boss to complain about mistreatment.

d. Ms. James did complain to Plaintiff that she, Ms. James, did not like the fact that "they" were always bypassing the system to hire all of their family members and friends, but that they fired her brother. Whenever Ms. James used the term "they," Ms. James meant the Whites in the office, led by Hall. Ms. James would often tell Plaintiff

that she and Plaintiff needed to "stick together" because "they" will always look out for each other.

e. Hall made race a factor in Hall's efforts to undermine Plaintiff, in trying to get Ms. James, as a cats paw, to call Lahmann, CFO of Sunbelt, or the central office and complain about Plaintiff, because if there were a legitimate reason to complain to the central office, then why would anyone be afraid to complain directly, rather Hall tried to use a Black employee to complain to hide his discriminatory and retaliatory intent.

f. In about 2023, Ms. James came to work upset about something that had happened at home. She snapped at Plaintiff, who made the statement, "This is going to stop". Ms. James thought the Plaintiff meant that she was going to terminate her, Ms. James, so she called Bob Lahmann, of Sunbelt, to report Plaintiff. Ms. James told Bob Lahmann that if anything came across his desk about her, that it was personal. Plaintiff was contacted by Bob Lahmann of Sunbelt who did not tell her that Ms. James had called. Instead, he tried to see if the Plaintiff would say anything negative about Ms. James. The Plaintiff only had good things to say about Ms. James. Ms. James later went to Plaintiff and confessed and apologized. Ms. James said she thought Plaintiff was going to fire her and needed her job. Ms. James said that Hall's group was pushing her to call Bob and report Plaintiff. Ms. James kept saying "they' were pushing her to contact Lahmann, CFO of Sunbelt, about Plaintiff, but when Plaintiff pressed Ms. James about who "they" were in this instance, Ms. James would only give Plaintiff one name, Dean Long, a White male who is the Sales Manager.

g. Other than the challenged discriminatory and retaliatory terminations, Bob Lahmann, Plaintiff's supervisor, never took adverse action against Plaintiff, where the

Employee Survey was used in deviation from accepted practice, and as a pretextual device, instead of an Evaluation.

h. Plaintiff treated Ms. James fairly and helped her out, when Ms. James had financial trouble on the amount she was paid. She also bought Ms. James and her other employees gifts from time to time.

i. Hall continued to use Ms. James against Plaintiff by making negative statements to his group who would then repeat the negative statements to Ms. James, where Hall foreseeably believed it would make Ms. James complain about Plaintiff, resulting in adverse action.

j. Benning once told Plaintiff that she thought that Joe Hall resented a smart Black woman telling him what to do. She also shared with Plaintiff that during an HR meeting about Ms. James disrupting the office with false statements, using profane language towards Benning in the presence of a supervisor, Terrence Cook, that, according to Benning, Hall was almost rolling his eyes.

**Protected Activity in December and Retaliation**

242. In December 2023, while Joe Hall was at a corporate manager's meeting in Phoenix, a racially derogatory writing was discovered on the wall in the men's restroom in the plant, where most of the Blacks worked.

243. A White employee from the plant came to Plaintiff and complained about the racist slur and asked that Plaintiff address the derogatory writing.

244. Plaintiff took a picture of the racial slur and sent it to Joe Hall, who asked her to have the maintenance manager remove it.

245. Sunbelt had a policy that prohibited discrimination and harassment based on race, and other prohibited factors, which was consistent with the law.

246. When Hall returned Plaintiff asked to meet with him about an investigation, because there were security cameras in the plant, that could be examined and it might have been possible to identify who had used the bathroom before the graffiti appeared and after it appeared, and when it was first noted.

247. Hall never began an investigation to determine to find out who had written the racially hostile graffiti on the bathroom wall in the plant.

248. Plaintiff also wanted to discuss a personnel issue that occurred between Ms. James and Ms. Benning while Hall was in Phoenix.

249. Hall never came back to Plaintiff for a meeting and showed no interest in having a meeting.

250. Hall held no meetings and sent out no warnings about the prohibitions against racially hostile graffiti.

251. Plaintiff's reporting of and asking Hall to investigate racially hostile graffiti and therefore harassment constituted protected activity under Title VII and Section 1981.

252. While Plaintiff had been due for evaluations, one after the first 90 days, then once every 12 months using the company approved Evaluation form according to company policy, no evaluations had occurred.

253. Three months before Southeast unlawfully terminated Plaintiff in February 2024, Hall had the White employees under his control in the office, participate in an anonymous "Employee Survey."

254. According to policy there that was biased because the staff had been prejudiced against her by Joe Hall.

255. Plaintiff's own staff, Alegtha (Lisa) Ms. James and Morgan Benning, were not allowed to participate in the survey.

256. The use of the "Employee Survey" process, as an Evaluation was a deviation from accepted process, and a sign of unlawful adverse treatment.

257. An employee had a right to a rebuttal process under a legitimate evaluation process.

258. By the time of Plaintiff’s termination there was a legitimate evaluation process, and a progressive discipline process.

259. No discipline was ever issued to Plaintiff and no improvement process was ever issued.

260. Instead, the Employee Survey was used by Lahmann and Hall, and the help of the other Whites under his control, as a sham evaluation process, as a pretextual basis for a termination that was discriminatory or retaliatory.

261. During this survey review in Plaintiff's office, Plaintiff reported to her manager Bob Lahmann how Joe Hall had been treating her more adversely from other managers, who Lahmann, CFO of Sunbelt, knew were White males.

262. Even though he was a supervisor and had a duty to investigate and take reasonable corrective measures about discrimination, Bob Lahmann, CFO of Sunbelt, just asked Plaintiff why she did not just quit; demonstrating the company's indifference to the duty to react reasonably to stop discrimination complaints.

263. Plaintiff dropped the subject when Lahmann showed that he was not concerned at all about Hall's discriminatory treatment of her.

264. Although Plaintiff had a dotted line to Hall, when she went to him with a personnel issue, a process issue or other management issue in which she need his opinion, he offered no support; but if Plaintiff said she needed to buy some supplies or office furniture, he never said no; but for support of her management authority, he never offered any help.

265. Lahmann took no action, let alone reasonably corrective action

266. In the Ellaville office of Southeast, the following were family and were all White: Claude Yarbrough, Rufus Yarbrough Jr., Duane Berry, Dean Long, Joshua Mattson.

267. The following are all White friends who and associated socially: Joe Hall, Claude Yarbrough-Joe's Best Friend, Duane Berry, Jackson Benjamin, Tina Powell, Rufus Yarbrough Jr., Dean Long, and Reuben Widner.

268. Plaintiff was never asked to socialize by any of the Whites.

**Hall Had Training from Plaintiff on legitimate Employee Evaluation and Displine Process, which Was Not Followed as to Plaintiff**

269. In 2022-2023 Plaintiff had to counsel and train Joe Hall and Duane Berry (Plant Manager) regarding the importance of a progressive discipline and documentation process in making HR decisions, including as a documentation of decisions based on legitimate reasons, to prevent discrimination and retaliation, and to protect the company from lawsuits.

270. Plaintiff advised that employees should be written up on the personnel status form, showing that the employee was given notice of the problem, and an opportunity to correct and/or improve on the particular issue.

271. She advised that if the process were followed the employee could not say that you did not give them a chance for improvement if you had this form signed by both the manager and the employee who reports to that manager.

272. It took a while, but both Hall and Berry understood how important this process is and began documenting as advised.

**Pretextual Termination**

273. On February 7, 2024, Bob Lahmann flew in from Sunbelt headquarters in Phoenix, Arizona and terminated Plaintiff without following the established process, without using the proper forms that made managers address legitimate issues, without any period for improvement, or other notice.

274. Lahmann, the Sunbelt CFO who had made sure Plaintiff was implementing a trustworthy progressive discipline scheme to promote legal employment decisions and deter illegal employment action, that would legitimately help protect Sunbelt, CFO Lahmann had no paperwork of notice to Plaintiff about improvements or warnings, and in spite of Plaintiff having taught Hall about documenting to follow the correct process about progressive discipline documentation, where Hall knew the legitimate way to document real problems, because Hall used documenting on others before the termination of Plaintiff.

275. Lahmann was not in the Ellaville office on a daily basis to know and understand the truth of the situation, and although he was a manager who had a duty to investigate claims of adverse treatment g based on prohibited factors, especially before terminating someone Sunbelt had hired to bring the Ellaville plant into compliance with law and Sunbelt imposed efficiency and accountability changes, he did no real investigation, falling in lock step with Hall's plan to eliminate the Black woman from the management team, so she could not correct him, and so she would not be a threat to replace him, where Plaintiff's education, skills and experience was strikingly superior to those of Hall, and

any of the Whites who were considered for Plaintiff's position or the General Manager position, or the District position now held by Hall. .

276. Lahmann never talked to Plaintiff nor expressed concerns about her performance.

277. Lahmann willfully and wantonly overlooked Southeast or Sunbelt's pretextual use of the "Employee Survey" as a legitimate employee evaluation and 'final notice' and also ignoring the fact that the sources of the opinions were not those of supervisors, were anonymous though the staff was known and was White and controlled by Hall, and Lahmann had not allowed Plaintiff, someone Sunbelt hired to bring their new purchase into compliance with the law and efficiency, to challenge the highly subjective and vague complaints, which are therefore suspect for prohibited motive, prior to the challenged termination, or to reverse it.

278. The termination was driven by Hall's discriminatory and retaliatory motives, and/or persons with similar motives, or people in the officer who Hall was using as a cat's paw to carry out Hall's illegal adverse treatment of Plaintiff.

279. When Plaintiff asked Lanham why he was terminating her, Lahmann initially said, "I can't tell you;" then later said late payrolls and late accounts payable, but no one had counseled Plaintiff, written her up, given her a written or verbal warning, or asked her to explain these alleged issues.

280. Plaintiff disputed these allegations by telling him that this was not true.

281. Lahmann did not respond to the facts and did not conduct an investigation.

282. Lahmann followed the path hoped for and orchestrated by Hall, indicating that "the decision has already been made," showing a deviaiotn from accepted process, revealing the pretextual nature of the termination.

283. On February 7, 2024, the day of the termination of Plaintiff, Hall immediately replaced Plaintiff with Tina Powell, a White woman, who at the time was 54 years old, and the Plaintiff was about 65 years old.

284. Tina Powell, who was White, was a long-time friend of Hall's, and their interactions and jokes with one another in the office showed that Hall and Powell were friends.

285. Hall never similarly joked or interacted with Plaintiff.

286. Before she came to the company, Ms. Powell's background was as an LPN.

287. Ms. Powell was hired in January of 2020 and was in HR in September of 2020, assigned to help answer the phone, give out applications, order office supplies, giving messages to employees, and similar tasks like a secretary/receptionist.

288. When Plaintiff was hired, in September 2020, she was the head of Accounting and HR, so Tina Powell and Denise Brown both were to report to Plaintiff, which meant Powell was a subordinate of Plaintiff.

289. In December 2020, Hall moved Powell from HR to report directly to him to do, as he said, "special projects," whatever Hall needed her to do for him.

290. Between January 2021 and the termination of Plaintiff in February 2024, Powell was listed as being in the Engineering Department, title Project Coordinator, or similar title, and she worked on special projects for Hall.

291. Between December 2020 and the termination of Plaintiff in February 2024, she continued to do special projects for Hall, and she did not receive any training about Accounting or HR of which Plaintiff was aware.

292. As soon as Hall and Southeast terminated Plaintiff in February 2024, Hall installed Powell in Plaintiff's position, even though Powell did not meet the job qualification

requirements imposed as a condition of Plaintiff's hiring, in that Powell had no experience in Accounting or Human Resources, no Accounting degree, and no Bachelor's degree despite the qualifications Southeast required of Plaintiff: a Bachelor's degree, five years of experience in Accounting, five years of supervisory experience and three years of experience in a manufacturing or similar environment.

293. Southeast and Sunbelt, the parent company, brought in at least two individuals to train Powell to do the job Plaintiff had previously held and for which Plaintiff met all the qualifications; and when the record is lawfully construed had a good performance record, and but for race discrimination and retaliation, Plaintiff would not have been replaced by Powell.

**Post-Termination Evidence of Discrimination**

294. The company provided extensive training resources to Plaintiff's younger, White replacement that were never provided to Plaintiff, with people coming in from corporate to assist in training the replacement.

295. The separation notice falsely stated termination was "due to performance" despite Joe Hall never providing performance feedback directly to Plaintiff.

296. Direct report Alegtha Ms. James initially maintained contact with Plaintiff but contact ceased abruptly after the company instructed the entire group to cease all contact with Plaintiff.

**Pattern of Racial Discrimination Against Other African American Employees**

297. Victor Flowers, an African American employee, who was an hourly employee in the Final Finish department, was accused of sexual harassment by a White woman.

298. Flowers was terminated without any input from HR.

299. When Plaintiff reviewed the documents, it was obvious the conduct did not constitute sexual harassment.

300. Hall and other Whites knew that Plaintiff was investigating the allegations against Flowers.

301. Plaintiff was finding that the allegations were wrong and she told Hall about the results of the initial inquiry in approximately April 2023.

302. Before Plaintiff could bring Flowers back to work, another employee, Charlene Hogg made additional accusations in approximately April 2023.

303. Patrick Koroma, a Black man from Africa, was fired for alleged performance issues in late December 2022 to make room for Toby Sexton, a White man and relative of another White employee, Rufus Yarbrough Jr.

304. Sexton was hired in early January 2023, despite Koroma having no idea that management was dissatisfied with his work.

## IV. CLAIMS FOR RELIEF

*COUNT I*

RACE DISCRIMINATION IN VIOLATION OF TITLE VII

305. Plaintiff incorporates by reference all preceding paragraphs.

306. Defendant discriminated against Plaintiff because of her race (African American) in the terms and conditions of her employment, including but not limited to:

a. Subjecting her to a hostile work environment;

b. Denying her training and support provided to White managers, and causing her to work excessively, correct the problems so the Accounting and HR correctly, firing

Plaintiff, and replacing her with a White, while not making that opportunity available to Plaintiff;

c. Failing to provide performance evaluations and pay increases given to White male managers who were similarly situated;

d. Subjecting Plaintiff to technical and personnel performance capacity sabotage and systematic undermining on account of race;

e. Allowing and encouraging harassment by supervisors and coworkers, all of whom were White, even though she had objected to Lahmann in 2023.

f. Terminating Plaintiff on account of race, and replacing her with a less qualified White; without offering the new and improved position to Plaintiff, or others without regard to race or gender; especially after using Plaintiff to make the new position tenable, by Plaintiff's long hours, in conditions of abusive treatment on account of race and gender.

g. Terminating Plaintiff without following required progressive discipline or conducting a legitimate investigation.

307. Defendant's conduct violated Title VII, 42 U.S.C. § 2000e et seq.

308. As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered economic damages, emotional distress, and other compensable injuries.

309. Defendants' actions and refusals to act were in willful and wanton disregard of the rights of all, warranting punitive damages.

*COUNT II*

RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

310. Plaintiff incorporates by reference all preceding paragraphs, including Count I a race claim, where similar proof supports either claim.

311. Defendant intentionally discriminated against Plaintiff because of her race, depriving her of the same right to make and enforce contracts as is enjoyed by White persons, in violation of 42 U.S.C. § 1981.

312. Defendant's discriminatory conduct was intentional, deliberate, willful, and in callous disregard of Plaintiff's rights.

313. Defendants terminated Plaintiff on account of race, or other unlawful reason.

314. Defendants replaced Plaintiff with an unqualified White, who was friends with Hall.

315. Without providing Plaintiff with the opportunity to compete for or negotiate for a contract or employment for the position as it existed when Defendants terminated Plaintiff on account of race, or other prohibited reasons, Hall and Defendants had in place a process to preclude Plaintiff from employment and employment opportunity.

316. Had Plaintiff remained with Defendant, given her superior education, skill and experience, but for the challenged unlawful treatment, in a company that operated legitimately, she could have been in the district position now held by Hall.

317. As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered economic damages, emotional distress, and other compensable injuries.

318. Defendants' actions and refusals to act were in willful and wanton disregard of the rights of all, warranting punitive damages.

*COUNT III*

RETALIATION IN VIOLATION OF TITLE VII

319. Plaintiff incorporates by reference all preceding paragraphs.

320. Plaintiff engaged in protected activity by reporting racial harassment found in the workplace restroom.

321. During the October 2023 interview with Sunbelt CFO Lahmann, Plaintiff also complained about discriminatory and harassing treatment by Hall and other White managers.

322. Rather than investigate these complaints, CFO Lahmann's response was to suggest that Plaintiff should have just quit; notwithstanding Defendant's duty under the law to investigate and take reasonable action to prevent further discrimination and hostile treatment on account of race or gender.

323. Defendants knew of Plaintiff's protected objection to discrimination and hostile treatment by Hall and other White male managers on account of Plaintiff's race, because it was stated directly to CFO Lahmann in October 2023.

324. Hall and Procunier knew of Plaintiff's complaints because, as a matter of common sense and law, it is reasonable to infer that upper-level managers Hall, Lahmann, and owner Procunier had the opportunity to discuss, and did discuss, important business matters. An allegation by Plaintiff—the Accounting and HR manager, a credible and experienced upper-level manager in the production industry with programming skills and a BA in Accounting—making allegations of discrimination and hostile treatment by Hall and White male managers, constitutes a serious risk management issue with potential individual liability for Hall.

325. Upon information and belief Hall and Lahmann could have discussed these alone or they could have talked to Procunier, who approved the termination, including at the December 2023 plant managers meeting in Phoenix.

326. Lahmann used the Employee Survey as a sham evaluation in October 2023, to lay a false foundation for the unlawful February 2024 termination.

327. But when Lahmann terminated Plaintiff in February 2024, when he was asked by Plaintiff why she was being terminated, at first he said he could not say, and when pushed he said it was late accounts payable and payroll, to which Plaintiff objected as not being true, and then Lahmann shifted the reason again and said that the decision had been made, and then he apologized as he left the room, and became visibly shaken for the rest of the day.

328. Attempts by Plaintiff to clear this up fell on deaf ears, and Hall immediately replaced Plaintiff with Tina Powell that day.

329. The circumstances involved an office in a small town where many of the staff were relatives and White, the staff was strongly and predominantly White, the laborers were Black or other minorities, and profanity was used by management toward minority laborers and, in this case, Black management staff including Plaintiff.

330. It was a shock to White male General Manager Hall for Procunier to have placed a well-educated and highly experienced Black woman in a plant where she was more qualified to be the General Manager than Hall himself.

331. Hall resented Plaintiff's qualifications and experience and carried out a plan, to which Lahmann and Procunier became complicit, resulting in a racially and retaliatory driven termination.

332. Defendant took adverse employment action against Plaintiff by terminating her employment.

333. The pretextual termination in deviation of required process suggests that the real reason or reasons are unlawful, which is consistent with Hall's goal to get rid of the educated and experienced Black woman, who could replace him, and replace Plaintiff with a Whtie woman, who was beholden to Hall, because in spite of her lack of education and experience, she had a great, high paying job, because of Hall, and the refusal of Lahmann and Procunier to investigate or correct, or because they were knowingly complicit.

334. The early training of Powell, and Powell training Sexton to fill her role working for Hall, and the placement of Powell in Plaintiff's position on the day of termination suggest advance planning and discussion between managers.

335. Defendants replaced Plaintiff with an unqualified White employee who was friends with Hall, without even providing Plaintiff with the opportunity to compete for or negotiate a contract for the position as it existed when Defendants terminated Plaintiff.

336. There was a causal connection between Plaintiff's protected activity and the adverse employment action, as evidenced by the timing and pretextual nature of the termination.

337. The sequence of events—from Plaintiff's October 2023 complaints to CFO Lahmann through the February 2024 termination—demonstrate a clear cause and effect pattern of retaliation for Plaintiff's protected activity.

338. Hall has been promoted and is a District Manager, probably making between $200,00 and $500,00, while Plaintiff remains unemployed and emotionally scared.

339. There was a causal connection between Plaintiff's protected activity and the adverse employment action, as evidenced by the timing and pretextual nature of the termination.

340. Defendant's conduct violated Title VII, 42 U.S.C. § 2000e et seq.

341. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered economic damages, emotional distress, and other compensable injuries.

342. Defendants' actions and refusals to act were in willful and wanton disregard of the rights of all, warranting punitive damages.

*COUNT IV*

HOSTILE WORK ENVIRONMENT BASED ON RACE AND GENDER IN VIOLATION OF TITLE VII

343. Plaintiff incorporates by reference all preceding paragraphs.

344. Plaintiff was subjected to unwelcome harassment based on her race, and gender, which was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive working environment.

345. The harassing conduct included:

a. Joe Hall's profanity-laced confrontations with Plaintiff, using the "F" word openly in the office, at least once per week when angry about some management aspect related to Plaintiff's position, and yet he never wrote her up, and she received yearly pay increases;

b. When Plaintiff advised Hall that he was unlawfully taking action based on race and advising him on legal HR requirements, Hall's statement was that "I don't care what the law is. No one is going to tell me how to run my plant";

c. Hall's systematic efforts to turn his entire staff against Plaintiff, created a climate of resentment and stress to which White employees were not similarly subjected;

d. Whenever employees (especially Black employees) sought Plaintiff's guidance Hall's hostile behavior directed at Plaintiff was on account of race and sex or protected racial association;

e. The Purchasing Manager, Claude (CJ) Yarbrough, who is a White male, yelled at Plaintiff that he was "sick and tired of all of the changes" and demanded that Plaintiff "get out of his office," so loudly it could be heard by all in the office, including Hall, but no corrective action was taken. Plaintiff knew that Hall had heard it because his office was right next door, and he later acknowledged that he heard everything but decided not to get involved.

f. Hall's response to Plaintiff's attempt to discuss the abuse and disrespect for Plaintiff's duties relative to legitimate company business by the White male Purchasing Manager was met with further animus by Hall, who stated he had no time for Plaintiff. Plaintiff later reported this to her then manager, Don Whitehead, who asked Plaintiff if she wanted him to talk to Joe Hall. Plaintiff said no because Whitehead was laughing and Plaintiff knew it would only anger Hall and make matters worse.

g. The systematic exclusion of Plaintiff from authority and decision-making by making decisions regarding firing employees without input from Human Resources and excluding the Accounting Manager from production-related meetings where discussion of new customers occurs, while White employees were treated with respect and inclusion in meetings which discuss the business and direction of the business, new customers, etc.

h. Racial graffiti in the workplace restroom without management addressing it;

i. The mostly White office staff made it clear they did not want to take direction from Plaintiff, as shown by the following: Being openly confrontational as with Claude Yarbrough, a White male, not willing to adhere to new requests by the corporate office and Rufus Yarbrough Jr., a White male, not wanting Plaintiff to have input on Safety issues or to be involved at all.

346. Plaintiff complained to management about the discriminatory treatment during the sham October 2023 Employee Survey review conducted by Lahmann, specifically reporting to manager Bob Lahmann how Joe Hall had been treating her differently from other managers who were all White males.

347. Joe Hall would laugh and joke with the White office management and staff but never laughed and joked with Plaintiff.

348. He would always give her a blank stare or was angry most of the time when Plaintiff and Hall conversed.

349. Plaintiff also engaged in protected activity by reporting the racial harassment graffiti found in the men's restroom to Joe Hall in December 2023.

350. Despite these complaints, Defendant failed to take reasonable measures to stop the harassment.

351. Instead, Bob Lahmann asked Plaintiff why she did not "just quit," demonstrating management's indifference to the racially hostile work environment.

352. Joe Hall never addressed the racial graffiti incident with the plant workforce nor took any corrective action, despite Plaintiff's report.

353. The harassment was based on Plaintiff's race as evidenced by:

a. The absence of any people of color in office positions until July 2021, while the plant manufacturing floor, with manual laborers, had many people of color;

b. Hall's particular hostility toward Black employees who sought Plaintiff's guidance;

c. The discriminatory treatment affecting other African American employees, including Victor Flowers, Patrick Koroma, Delmar Solomon, and Henry Sims;

d. Sunbelt's indifference to investigating or remediating the racial slur on the bathroom wall in the plant, intended to be seen by the Blacks who were a large presence in the plant.

e. Plaintiff was made to work long hours for a prolonged period to put the business in order, all the while Hall was carrying out a plan to terminate Plaintiff as soon as the business was running smoothly, and replace Plaintiff with his long-time White friend who was unqualified for the job.

354. A reasonable person in Plaintiff's circumstances would have found the work environment to be hostile and abusive.

355. The hostile work environment was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment, making it difficult for her to perform her job effectively.

356. Plaintiff suffered severe emotional distress, which she suffers today and will continue to suffer, and it adversely impacts her ability to work.

357. As a direct and proximate result of the hostile work environment, Plaintiff suffered severe emotional distress, anxiety, and other compensable injuries.

358. Defendants' actions and refusals to act in the face of duty to act to stop the illegal treatment were in willful and wanton disregard of the rights of all, warranting punitive damages.

*COUNT V*

HOSTILE WORK ENVIRONMENT BASED ON RACE VIOLATING 42 U.S.C. § 1981

359. Plaintiff incorporates by reference all preceding paragraphs, in particular in Count IV, because the law is similar and the facts alleged in Count IV state a plausible hostile environment claim under § 1981.

360. Defendant, through its agents, supervisors, and employees, intentionally created and maintained a hostile work environment based on Plaintiff's race, interfering with her right to make and enforce contracts on the same terms as White employees.

361. The racially hostile conduct was severe, pervasive, and created an abusive working environment that no reasonable person should have to endure.

362. Defendant's conduct was intentional, deliberate, willful, and demonstrated a callous disregard for Plaintiff's civil rights.

363. As a direct and proximate result of the hostile work environment, Plaintiff has suffered economic damages, severe emotional distress, and other compensable injuries.

364. Defendants' actions and refusals to act in the face of duty to act to stop the illegal treatment were in willful and wanton disregard of the rights of all, warranting punitive damages.

*COUNT VI*

RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

365. Plaintiff incorporates by reference all preceding paragraphs, in particular the facts alleged in Count III, where a claim for retaliation under 1981 can state a claim under Title VII. .

366. Plaintiff opposed practices made unlawful by Section 1981 by reporting racial harassment and discriminatory treatment.

367. Defendant retaliated against Plaintiff because of her opposition to discriminatory practices by terminating her employment.

368. Defendant's retaliatory conduct was intentional, deliberate, willful, and in callous disregard of Plaintiff's rights.

369. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered economic damages, emotional distress, and other compensable injuries.

370. Defendants' actions and refusals to act were in willful and wanton disregard of the rights of all, warranting punitive damages.

*COUNT VII*

DISCRIMINATION BASED ON GENDER IN VIOLATION OF TITLE VII

371. Plaintiff incorporates by reference all preceding paragraphs.

372. Defendant discriminated against Plaintiff because of her gender, female, in the terms and conditions of her employment, including but not limited to:

a. Subjecting her to a hostile work environment; in which male managers, like Hall and others, actively disrespected Plaintiff, notwithstanding her position as a manager, of HR and its connection to safety;

b. Denying Plaintiff training and support provided to male managers;

c. Causing Plaintiff to work excessively, where male managers never had to work as much as Plaintiff.

c. Failing to provide performance evaluations and pay increases to Plaintiff that were given to similarly situated male managers;

d. Allowing and encouraging harassment by supervisors and coworkers, where no such harassment was foisted on male managers, and when a male challenged Hall with profanity Hall had first imparted on the male, the male was fired, but Hall was continuously engaged in demeaning Plaintiff with profanity, to show his male superiority.

e. Hall took some of the male employees and managers to play golf, leaving work early, but he never asked Plaintiff to go play golf or leave work early or not appear at all on Fridays, which was a steady occurrence for Hall and his male friends.

f. Upon information and belief Hall preclude any woman from becoming General manager by preselecting a male friend and precluding an open application process.

g. Plaintiff was terminated for reasons which no male would have been terminated.

373. As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered economic damages, emotional distress, and other compensable injuries.

374. Defendants' actions and refusals to act were in willful and wanton disregard of the rights of all, warranting punitive damages.

**V. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against Defendant on all counts;

B. Award Plaintiff compensatory damages, including back pay, front pay, and benefits;

C. Award Plaintiff damages for emotional distress and other non-economic injuries;

D. Award Plaintiff punitive damages;

E. Award Plaintiff reasonable attorneys' fees and costs; and,

F. Grant such other and further relief as this Court deems just and proper.

**VI. JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted, this 25th day of June, 2025.

/s/ John P. Batson
John P. Batson
Ga. Bar No. 042150

*Attorney for Plaintiff Barbara Wilbon*

1104 Milledge Road
Augusta, GA 303904

jpbatson@aol.com
Office 706-737-4040
Cell 706-373-6108